WILL OF ADLER: SMITH, Guardian *ad litem,* Appellant, v. REINHART, Guardian *ad litem,* Respondent.

*February 3—March 1, 1966.*

252

"...

254

For the appellant there were briefs and oral argument by *Richard C. Smith* of Jefferson.

For the respondent there was a brief and oral argument by *John M. Reinhart* of Milwaukee.

HEFFERNAN, J.

We are concerned with whether a child adopted by a principal beneficiary after the death of the testator can take under a will that directed that the proceeds of a trust be distributed to the principal beneficiary or in the case of her death to her "issue."

The child here is claiming under a will as a contingent beneficiary, and her rights must therefore be determined by the testator's intention as expressed in the will. *Estate of Uihlein* (1955), 269 Wis. 170, 173, 68 N. W. (2d) 816. It is conceded that that expression of intent is ambiguous by reason of the fact that the testator's use of the term "issue" arguably could refer exclusively to a child of the blood or could refer to one in the line of descent by reason of adoption. It is stipulated that no conduct or utterance of the testator furnishes extrinsic evidence to aid in resolving this question. The ambiguity arises when the interpreter of the will is confronted with the fact that one not a blood relative of the principal beneficiary, but an adopted daughter, makes claim as an "issue."

We held in the *Estate of Breese* (1959), 7 Wis. (2d) 422, 429, 96 N. W. (2d) 712, that in using the term "issue," the testatrix was referring to two adopted children of a brother. This court has, on other occasions, taken the position that "issue" is "ordinarily construed as meaning blood descendants." *Estate of Uihlein* (1955), 269 Wis. 170, 177, 68 N. W. (2d) 816. It is apparent that, although on the face of the will no ambiguity exists, there is an ambiguity which now appears upon

consideration of the extrinsic circumstances. In the *Estate of Breese, supra,* page 424, where, at the time of the will's execution, only two of the testatrix's elderly brothers had children, and one of them had adopted children only, the language, "the issue of any or either of my said brothers," was held to include the adopted children.

Here it is conceded that the question of adoption had not been discussed with the testator, nor had the family been confronted with the fact of adoption at the time of the testator's death.

"In construing a will the purpose of the court is to ascertain the intent of the testator . . . in the light of the circumstances surrounding the testator at the time the will was executed." *Estate of Breese* (1959), 7 Wis. (2d) 422, 425, 96 N. W. (2d) 712.

The status of the law, both statutory and the case law of this court, is a circumstance to be considered.

We said in *Lichter v. Thiers* (1909), 139 Wis. 481, 486, 121 N. W. 153:

"One must always look to the will to be construed to determine its meaning, having due regard to the existence of any statute or legal principle of the unwritten law or other circumstance which the testator may have had in mind at the time of expressing his testamentary wishes, which will aid in reading the language from the standpoint of the testator when he used it."

4 Page, Wills (rev. ed.), p. 166, sec. 30.27, states the general rule:

". . . that the law that was in force when the will was executed is the law which determines the intention of the testator. . . . If the will has been republished by a codicil, it is the law as it stood when the codicil was executed."

In the *Estate of McDonald* (1963), 20 Wis. (2d) 63, 67, 121 N. W. (2d) 245, this court stated that both statutory and case law were extrinsic aids that could be

used, and that the testator is presumed to know the law, both statutory and case law.

The testator's will in the instant case was executed on February 22, 1949. Codicils reaffirming the disposition were executed on March 31, 1953, and May 2, 1953.

The adoption statute in effect at the time of the execution of the will and the subsequent execution of the relevant codicils was sec. 322.07 (1), Stats., published June 11, 1947, as ch. 218, Laws of 1947. It provides:

*"Effect of adoption.* (1) Except as otherwise provided in this section, the effect of the order of adoption is to completely change the legal status of the adopted person from that of a child of the natural parents to that of a child of the adoptive parents; and to free the adopted person from all legal obligations to or on account of the natural parents, and vice versa."

Sec. 370.01 (8), Stats. 1947, provided:

*"ISSUE.* The word 'issue,' as applied to descent of estates, shall be construed to include all the lawful lineal descendants of the ancestor."

Admittedly, former decisions construing former statutes have been most reluctant to confer a "first class" status on an adopted child. In view of the statutes that then existed, there was much to justify the position then taken. In *Lichter v. Thiers, supra,* page 487, emphasis was placed upon the fact that the purpose of the adoption statutes was to give the "child the same rights as against his adopted parents as to disposition of property by the law as those possessed by a child of the parents born in lawful wedlock, and to go no further as to property rights," and it was agreed that it did not change the law in respect to the relationship of the adopted child *vis-a-vis* third parties. The provision excepting them from inheriting as "heirs of the body" was specifically set forth and remained in our statute law until 1945. (See sec. 322.07, Stats. 1941, ch. 259, Laws of 1941.)

It is clear that in the past this court in strictly construing past statutes has looked upon adoption as contractual filiation in a limited sense.

This court reiterated its position in this respect in the *Estate of Boyle* (1955), 271 Wis. 323, 329, 73 N. W. (2d) 425, quoting with approval language that had previously appeared in *Estate of Bradley* (1925), 185 Wis. 393, 396, 201 N. W. 973, and in *Estate of Uihlein* (1955), 269 Wis. 170, 176, 68 N. W. (2d) 816:

> " ' There are many reasons why an adoption statute should be strictly construed to enforce the duties and obligations voluntarily assumed by adoptive parents and to protect the adopted child in those rights and privileges which the law intends to secure to him as the result of the adoption. These reasons, however, do not apply when the rights of those who were not parties to the adoption proceedings are involved. The status resulting from adoption proceedings is not a natural one. It is a civil or contractual status. One may have the right to assume the status of a father to a stranger of the blood, but he has no moral right to impose upon his brother the status of an uncle to his adopted son. As was said in *Warren v. Prescott*, 84 Me. 483, 487, 24 Atl. 948, 17 L. R. A. 435, 439: "By adoption, the adopters can make for themselves an heir, but they cannot thus make one for their kindred." ' *Estate of Bradley*, 185 Wis. 393, 396, 201 N. W. 973."

In view of the present statute, we do not find the language quoted above controlling. The will of Adler was executed while sec. 322.07, Stats. (Laws of 1947) was in effect. The same statute remained in effect during the time the codicils were executed. This statute, as adopted by the legislature in 1947, defined the position of the adopted child as something more than a legally sanctified contractual arrangement between private individuals—it recognized that the adopted child acquired a new *status* and that the child's relationship to the adoptive parents was identical to that which had previ-

ously subsisted with its natural parents. The statute as is pertinent to this case read that:

".. . the effect of the order of adoption is to *completely* change the legal *status* of the adopted person from that of a child of the natural parents to that of a child of the adoptive parents, .. ." (Emphasis supplied.)

It is apparent that whatever doubts there may have been under previous statutes, this statute gives the artificial relation the same effect as a natural one.

At least two other cases in this court have construed wills which were given extrinsic interpretation by resort to sec. 322.07, Stats. (Laws of 1947). In the *Estate of Holcombe* (1951), 259 Wis. 642, 49 N. W. (2d) 914, we held that sec. 322.07 gave the adopted person the status of "issue" of his adoptive parent, giving the adopted child the same status as one natural born, and therein we quoted with approval from the *Will of Vedder* (1943), 244 Wis. 134, 136, 11 N. W. (2d) 642, which utilized the definition of "issue" as set forth in sec. 370.01 (8):

Issue. "The word 'issue,' as applied to descent of estates, shall be construed to include all the lawful lineal descendants of the ancestor."

We concluded in *Vedder, supra,* page 137, that the statutory definition must be "considered as strong evidence of the usual and accepted meaning of the term 'issue,'" even as applied to a testate estate.

In the *Estate of Nelson* (1954), 266 Wis. 617, 619, 64 N. W. (2d) 406, we held the statute gave an adopted child the status of a lineal descendant of his adoptive parents, and held that the adopted child could inherit (by intestacy) from a brother of the adoptive parent. It is significant that the court specifically distinguished this case from earlier ones on the basis of the broader scope of the adoptive status as conferred by the 1947 statutes. It should also be noted that Mr. Justice Brown in construing sec. 322.07, Stats. (Laws of 1947) pointed out

that the statute was not exclusively applicable to cases of intestacy:

"There is nothing in the plain language of sec. 322.07 (1), Stats., whereby its meaning may vary depending on whether the deceased died testate or intestate. . . ." *Supra,* page 620.

*Estate of Holcombe* (1951), *supra,* was decided before the last relevant codicil was executed; hence, it must be considered as an extrinsic circumstance of which the testator was presumptively aware. *Nelson,* though decided after the execution of any of the relevant codicils, is interpretative of the statute that was in effect at the time the will and all of its codicils were executed.

We conclude that the statute as it existed at the time of the will's execution, completely changing the condition of the adopted child from that of a party to a contract (to which relatives of the adoptive parents were not privy) to that of a status identical to that of a natural born child, is an extrinsic fact that must be considered in determining the testator's intent.

The *Estate of Uihlein, supra,* came to the conclusion, under a very similar fact situation to that here, that an adopted child could not take under the will of a grand-father as the "issue" of a deceased adoptive parent. *Uihlein,* from a legal point of view, may be readily distinguished. It arose under the 1941 statute, which specifically excluded adopted children as "heirs of the body." The court also held that the adoption statute as it then existed did not apply in the case of a testamentary distribution. Additionally, this case was not decided until after the death of Frederic E. Adler. It cannot, therefore, be considered as a relevant extrinsic circumstance that might have bearing upon his intention.

Moreover, in determining the testator's intent, consideration should be given to the increasing social acceptance of adoption. As this court, in ascertaining the intent of a testator who executed a will in 1951, stated:

"The adoption of children has become so prevalent that such children are looked upon and accepted as the natural children of the adoptive parents by people generally. The word 'issue' is often used to include adopted children." *Estate of Breese* (1959), 7 Wis. (2d) 422, 430, 96 N. W. (2d) 712.

The number of adoptions has increased markedly since World War II.

". . . in 1951, 80,000 adoption petitions were filed in the United States—sixty percent more than in 1944; in 1955, the number of petitions filed increased to 93,000; in the period 1951 to 1960, almost a million children were adopted." Emilio S. Binavince, Adoption and the Law of Descent and Distribution, 51 Cornell Law Quarterly (1966), 152.

In Wisconsin the number of adoptions jumped from 1,091 in 1946 to 1,649 in 1954, the year of Frederic E. Adler's death. See Thomas H. Barland, A Re-Evaluation of Inheritance and Testamentary Rights with Respect to Adopted Children in Wisconsin, 1956 Wisconsin Law Review, 504. In 1954, Mr. Chief Justice CURRIE in the dissent to the *Estate of Cheaney* (1954), 266 Wis. 620, 627, 64 N. W. (2d) 408, pointed out the tendency of our court to expand the rights of adopted children as manifested in the decisions of this court.

In the past, courts have made "an emotional appeal to the principle of consanguinity . . . ." Courts have stressed "that the idea that blood relationship always has been fundamental in the law of descent and distribution, and that from time immemorial it has been held by English-speaking people that intestate property should descend to the kindred of the blood." 51 Cornell Law Quarterly, *supra,* page 176. These concepts were undoubtedly of great importance when the rules of primogeniture and the bloodlines of nobility were matters upon which feudal tenures depended and over which kingdoms could rise and fall. Adoption was not recognized

by the common law. 51 Cornell Law Quarterly, *supra,* page 155.

This theory is completely contrary to the present attitude of the family and of the public toward adoption. The tendency, desire, and public policy in every adoption is to completely absorb an adopted child into a family unit and to make his status in fact indistinguishable from that of a natural child, not only in his relationship with his adoptive parents, but, also, with the general public and with relatives who are not immediate members of the family circle.

It has been pointed out that the predecessor of the adoptive process was the device of indenture and apprenticeship. 51 Cornell Law Quarterly (1966), 155. If adoption was once considered a method whereby children of working age could be made employees of the adoptive parent, it is apparent that this is no longer true. The statistics of the Children's Bureau of the Department of Health, Education, and Welfare show that in 1955 a majority of children placed for adoption in this country were less than one month old, and only nine percent were six years of age or older. Adoptions are almost without exception made for the purpose of making the adopted child an integral part of the family circle for all purposes. Even the fact of adoption is a closed record in the court's files (sec. 48.93, Stats.), and upon adoption a new birth certificate may issue and all statistical particulars therein refer to the adoptive parents (sec. 69.33 and sec. 48.94).

Frederic E. Adler was a man of affairs who had amassed a large fortune. The trial judge in his exhaustive memorandum opinion referred to him as "knowledgeable."

We presume that Frederic E. Adler was aware of the changed attitude of the public in regard to adoption, and that he knew that the adoption of children was regarded as a normal possibility in any family, and that children

when so adopted were given the same status, love, and attention as children born in the bloodline.

The testator is presumed to be cognizant of the state of the law at the time of the execution of the will. *Estate of McDonald, supra,* page 67. It must be presumed that in using the term "issue," Frederic E. Adler was aware of the statutory changes and the interpretations of the statutes by this court which had the effect of completely changing the status of an adopted child in all respects to that of a child born in wedlock. We conclude that, conformably with the state of the law at that time, by the use of the word "issue," Frederic E. Adler intended to include any children of his nieces and nephews, either living or who might be subsequently born to, or later adopted by, them.

We hold, therefore, that Mary Louise Wray, an adopted child, has the identical status as a child born to the same parents in wedlock. We also conclude that whatever term may be used to describe a natural relationship applies with equal force and effect in describing a relationship that exists only by virtue of an adoption.

The testator is, of course, in no way limited in his right to make a will or to exclude by his will adopted children if he so desires, but if he wishes to deny any adopted person the benefits that might otherwise inure to him under a will, he must be specific in excluding him. In the *Estate of Boyle* (1955), 271 Wis. 323, 328, 73 N. W. (2d) 425, the testatrix gave expression to her intention by expressly providing that " 'throughout this will the word "issue" shall be construed to mean in each case legitimate child, children, . . . by blood respectively and not by adoption or otherwise.' "

We conclude that Mary Louise Wray is the "issue" of Jane Clare Wray, her adoptive mother, and is her child and descendant and is the beneficiary of the trust created under the terms of the will of Frederic E. Adler.

*By the Court.*—Order affirmed.