ESTATE OF BOERNER: BOERNER (John A.), Appellant, v. BOERNER (Martin J.), Executor, Respondent.

(Also reported in 174 N. W. 2d 457.)

*No. 85. Argued February 5, 1970.—Decided March 3, 1970.*

184

186

For the appellant there was a brief and oral argument by *Wayne W. Schlosser* of Sheboygan.

For the respondent there was a brief and oral argument by *Methodius J. Anzich* of Sheboygan.

ROBERT W. HANSEN, J. The executor takes the position that the legacy to the California-based nephew in paragraph two of the will refers only to those shares in the Boston Fund that had been held by the bank in Boston. Since such shares, acquired through dividend reinvestment, had been sold by the bank, the executor argues that the specific legacy to the nephew is adeemed by extinction.

The petitioner contends that paragraph two was intended by the testator and should be construed to refer to all of the shares in Boston Fund owned by the testator

at his death. Such contention apparently concedes that the sale by the testator of a portion of his Boston Fund holdings works an ademption by extinction on the part sold, but seeks the award of the remainder of the Boston Fund shares to him. The appeal raises certain definite issues, each made narrow and close by the facts of this case.

*Appealability.*

Not briefed nor argued by either party is the question of appealability. Since appealability goes to jurisdiction,[1] the duty of this court is to independently examine the record to determine if the appeal is proper.[2] The appeal is from a memorandum decision, and no subsequent order was entered. Probate is a special proceeding, terminated by order rather than by a judgment.[3] Although the better procedure would have been to enter a separate order, the memorandum decision here clearly was intended to be a final ruling,[4] so we treat it as an order, and, therefore, appealable.

*Latent ambiguity*

The construction of the terms of a will involves ascertaining the intention of the testator,[5] but such intention is to be determined from the words of the document and the surrounding circumstances at the time of its execution.[6] Extrinsic evidence, ordinarily inadmissible to determine intent,[7] may be offered as to actual

[1] *Szuszka v. Milwaukee* (1961), 15 Wis. 2d 241, 112 N. W. 2d 699.

[2] *Yaeger v. Fenske* (1962), 15 Wis. 2d 572, 113 N. W. 2d 411; *Estate of Keske* (1966), 33 Wis. 2d 64, 146 N. W. 2d 450.

[3] *Estate of Stoeber* (1967), 36 Wis. 2d 448, 153 N. W. 2d 599.

[4] See *Estate of Baumgarten* (1961), 12 Wis. 2d 212, 220, 107 N. W. 2d 169; *State v. Lamping* (1967), 36 Wis. 2d 328, 337, 153 N. W. 2d 23.

[5] See *Will of Adler* (1966), 30 Wis. 2d 250, 140 N. W. 2d 219.

[6] *Estate of Buser* (1959), 8 Wis. 2d 40, 98 N. W. 2d 425; *Estate of Southey* (1965), 26 Wis. 2d 335, 132 N. W. 2d 532.

[7] *Estate of Breese* (1959), 7 Wis. 2d 422, 96 N. W. 2d 712; *Estate of Gibbs* (1961), 14 Wis. 2d 490, 111 N. W. 2d 413.

intent in cases involving a latent ambiguity, defined by this court to be:

". . . where the language of the will, though clear on its face, is susceptible of more than one meaning, when applied to the extrinsic facts to which it refers.

"There are two classes of latent ambiguity. One, where there are two or more persons or things exactly measuring up to the description in the will; the other *where no person or thing exactly answers the declarations and descriptions of the will, but two or more persons or things answer the description imperfectly.* Extrinsic evidence must be resorted to under these circumstances to identify which of the parties, unspecified with particularity in the will, was intended by the testator." [8] (Emphasis supplied.)

In the case before us, such latent ambiguity arises from the fact that no securities held by the testator, either at the time of his death or at the time of executing the will, exactly answer the description given in paragraph two of the will. All of the Boston Fund certificates were, of course, issued in his name, but none were, in the words of the will, "held for safekeeping by Walter J. Brand & Co." 963 such shares were issued in his name, and were in his safe-deposit box at the time of his death. 260.764 shares, purchased for him by the bank in Boston from the proceeds of dividends, had been held for him by the bank, with periodic statements furnished to inform the testator of the exact amount of such bank-retained shares. Neither his Boston Fund shares held by the bank nor those found in his safe-deposit box exactly answer the description in the will; either or both do so only imperfectly. Which group of shares did the testator intend to refer to when he bequeathed "securities issued in my name and held for safekeeping by Walter J. Brand & Co.?" Or did he intend

---

[8] *Estate of Gibbs, supra,* at page 496; *See also: Estate of McDonald* (1963), 20 Wis. 2d 63, 66, 121 N. W. 2d 245; *Estate of Bletsch* (1964), 25 Wis. 2d 40, 130 N. W. 2d 275; *Estate of Jankewicz* (1966), 29 Wis. 2d 713, 139 N. W. 2d 662.

to refer to both groups, his entire holdings of Boston Fund shares? Enough of a latent ambiguity exists, in identifying exactly the securities referred to, to warrant the holding of the trial court that extrinsic evidence could be introduced as to the intent of the testator.

*Intent of testator*

The issue of admissibility of extrinsic evidence resolved, it becomes important to review the evidence made part of this record relating to the actual intent of the testator in paragraph two of the will. The securities dealer, Walter J. Brand, took the witness stand to testify that the only stocks owned by the testator were his shares in the Boston Fund. He testified that his company never kept stocks for safekeeping for any of their clients or customers. He further testified that it was his belief that the bank in Boston acted for the dealer in all of the shares involved in the cumulative investment program, whether held by the bank or the customer.

The principal witness on the issue as to intent was the attorney who drafted the will. He testified that he was a friend of the testator, that the testator often had done personal favors for him, and that he drafted the will in return for the favors done him by the testator. It was his testimony that the only shares of securities to which the testator referred were the ones specified in paragraph two and, on the direct point involved here, that the testator considered the Boston Fund securities to be one block, not to be two separate groups or blocks. When asked where such Boston Fund securities, referred to in the will, were located, the attorney answered, "I can tell you where he thought they were. Walter J. Brand, as stated in paragraph two." The attorney testified that the testator believed that all of his Boston Fund securities were held by Walter J. Brand. The then recent execution of the agreement with Walter J. Brand & Co., whereby the testator would no longer receive dividends in cash, might well be the basis for the mistaken belief

that all Boston Fund shares were with Brand for safe-keeping. However, the issue here is not one of credibility as between contradictory testimony or evidence. The evidence as to the intention and beliefs of the testator is uncontradicted. It stands uncontroverted either by other testimony or by physical facts or circumstances. The testimony of the attorney who drafted the will, corroborated in some measure by the testimony of the securities broker, leads to but one conclusion, that the testator intended to bequeath his shares in the Boston Fund to his nephew, all of them and not part of them.

This court has many times said that in a situation of this kind the court ". . . attempts to place itself in the position of the testator when he made his will . . . ." [9] Doing that in this case requires the conclusion that the testator intended paragraph two to cover his Boston Fund shares, those acquired by purchase and those purchased for him from dividends. The only testimony as to intent present in this record supports this interpretation. There is no testimony to support any other interpretation or conclusion.

*Confidential communication.*

The executor argues that the attorney who drafted the will was improperly allowed to testify as to statements made by the testator during the drafting of the will. It is contended that such testimony violates the attorney-client privileged communication rule. [10] If this objection is a valid one, the construction given the will as expressing the established intent of the testator would be fatally weakened for it rests in no inconsiderable measure upon the testimony of the lawyer who drafted the will as to statements made by the testator

---

[9] *Estate of Breese, supra,* at page 426.

[10] Sec. 885.22, Stats., provides: "An attorney or counselor at law shall not be allowed to disclose a communication made by his client to him, or his advice given thereon in the course of his professional employment. . . ."

when the will was prepared. However, this court has several times held that communications between an attorney and a client concerning a last will and testament, the transactions which led to the execution of the will, and the circumstances surrounding the execution of the will, do not enjoy the status of privileged communications after the client's death in a suit between the testator's heirs, devisees, legatees or other parties who claim through him.[11]

While the disagreement here is between the executor and a named legatee under the will, the outcome of this suit will be determinative of whether the property in question passes to the specific legatee, who is the petitioner here, or to the residual legatee. So the petition for construction of the will involves the respective rights of the specific and the residual legatee. As such, it clearly comes within the exception above noted and the testimony of the attorney as to statements made to him by the testator are admissible on the question of intent, once such extrinsic evidence became admissible. The trial court must be affirmed in holding that extrinsic evidence, including the testimony of the attorney who drafted the will, was admissible as to the intent of the testator. The trial court must be reversed in not accepting what such extrinsic evidence, uncontradicted and uncontroverted, clearly established as to such intent of the testator.

*Doctrine of ademption.*

There is and can be no real dispute as to the application to this case of the concept of ademption by extinction.[12] Under the construction of paragraph two urged

[11] *Estate of Landauer* (1952), 261 Wis. 314, 52 N. W. 2d 890, 53 N. W. 2d 627; *Estate of Smith* (1953), 263 Wis. 441, 57 N. W. 2d 727; *Estate of Brzowsky* (1954), 267 Wis. 510, 66 N. W. 2d 145, 67 N. W. 2d 384; *Estate of Breese, supra.*

[12] "In Anglo-American law, ademption connotes the taking away of the subject matter of a specific legacy or devise by its destruc-

by the executor, the entire bequest to the nephew would be extinguished, all of the property referred to had been disposed of by the testator during his lifetime. Under the construction of the will urged by the petitioner, and adopted by this court, the Boston Fund shares sold to pay for the auto are no longer available to pass under the specific bequest, but the balance of the Boston Fund shares remaining in the estate at the time of death are bequeathed to the nephew under paragraph two. So we have only a partial ademption by extinction. In applying the ademption concept, only two determinations are to be made: (1) Whether there has been a specific devise or bequest; and (2) whether the particular asset is in the testator's estate at the time of his death.[13] Here it is clear that we are dealing with a specific bequest, ". . . a gift by will of a particular thing, or specified part, of the testator's estate, . . ." [14]

Difficulty arises in distinguishing it from other parts of the estate, but, once paragraph two has been construed, the difficulty vanishes and clearly we deal here with a specific bequest. Under the second prong of the ademption test, it is likewise clear that, as to those shares of Boston Fund held and later sold by the bank in Boston, they were not in the testator's estate at the time of his death. So there remains, under paragraph two as herein construed, the 963 shares of Boston Fund found in the deposit box of the testator, which are bequeathed to the petitioner-nephew. When a part of a specific legacy is not in existence at the time of death, that part which still is in existence as part of the estate

tion or disposition by testator in his lifetime. . . . Thus the specific devise or legacy cannot be given effect because the specific property attempted to be devised or bequeathed is no longer part of the testator's estate at the time of his death. . . ." *Estate of Atkinson* (1963), 19 Wis. 2d 272, 274, 120 N. W. 2d 109.

[13] *Estate of Haberli* (1968), 41 Wis. 2d 64, 76, 163 N. W. 2d 168.

[14] *Id.* at 69.

passes to the legatee under the will.[15] It follows that 963 shares of Boston Fund shares pass to John A. Boerner under paragraph two of the will as herein construed.[16]

*By the Court.*—Order reversed, with directions to enter an order providing that 963 shares of Boston Fund, Inc., pass to John A. Boerner under paragraph two of the will of John B. Boerner.

[15] "The doctrine of ademption by alienation or extinguishment is generally held to operate pro tanto only, so that where only part of the subject of a legacy or devise has been destroyed or disposed of, the remainder still passes to the legatee." 57 Am. Jur. *Wills,* p. 1081, sec. 1581. *See also:* 96 C. J. S., *Wills,* p. 1016, sec. 1179 (b).

[16] It should be noted that sec. 853.35, Stats., created by Laws of 1969, ch. 339, sec. 26, alters the common-law doctrine of ademption by extinction, but is not effective until April 1, 1971.